cases we're going to hear and the first one is In Re Energy Future Holdings Corp appellate number 18-1957. Good morning your honors. My name is Michael Kim from Cobra and Kim representing the appellant at Delaware Trust Company and with the court's permission I would like to reserve three minutes for rebuttal. I'll be granted. Thank you your honor. May I begin judge? You may. So the first issue I want to turn the court's attention to is the issue that has been described as the momentum issue which takes up a significant portion of the briefing as different transaction structures are compared with each other and frankly there are lots of philosophical debates that I think counsel had to engage because the lower courts engaged in them as to which transaction looks more like an exchange or disposition and so forth and of course there are attempts to try to analogize the momentum at various levels but I would submit to the court that although counsel obviously had to engage in those issues because that's how the lower courts chose to think about the issue that really most of that is not directly relevant to how the issue should be decided and that is because there is no universal definition of collateral or proceeds. It's really not a philosophical issue. It's a very specific issue that is specific to the factual context in which the question arises. Let's talk about the facts here. The facts here substantially all of the assets in the debtor. Yes. And at some point those assets as I understand it get transferred or given or put in the possession of reorganized TCEH, correct? Correct. When those assets moved did the lien continue to run with those assets? The net result is that the liens did not run with those assets. What happened to the lien then? The liens were released pursuant to an agreement that the collateral agent entered into. What agreement did the collateral agent enter into? Are we talking about the reorganization plan? The plan support agreement caused the collateral agent essentially to release the liens and as part of the plan of reorganization the liens were released. No, there was nothing happened to the collateral then. The collateral served its purpose, liens were released, end of story, no transfer, no collateral was affected, no proceeds, it's over. As a result you don't satisfy even the first condition precedent to get to the waterfall, correct? So respectfully I would disagree because I think when we start talking about philosophically what happened to the collateral that's where we're getting away from the actual contract. But don't we have, there may not be a universal definition, but we have here within the documents themselves a definition and it talks about collateral security of the first lien obligations. It's collateral that is used as collateral security of the first lien obligations and what we have as Judge Schwartz is pointing out liens that didn't carry over to in some cases new or newly created assets. How could we find that it met that definition that appears in the agreements as to collateral? I think the first and really last point that resolves this issue is the definition of collateral in the pledge agreement which basically defines unlike momentum or any of these other scenarios TCEH itself is collateral because the shares of TCEH that was owned by the parent of TCEH was itself pledged. So in other words all this debate about the assets of TCEH and what happened to it, was it exchanged, is really besides the point because unlike momentum the company itself TCEH itself was collateral by definition. It was the assets of TCEH, not TCEH the entity. No, TCEH entity itself was the collateral. The whole thing was the collateral and that's what happened to it, what happened to TCEH the entity. So the two sides have two different versions of what happened to it. Under both versions it comes out the same way which is the appellees say, well Vistra Energy, TCEH, it's really just all the same thing, nothing happened to it. In which case then what was received was still collateral because the shares in TCEH held by the parent of TCEH itself was pledged. It's within the definition of collateral because these are pledged shares. So I think I have the same concern as the other judges, maybe I can put a little differently because I'm still not hearing an answer to their question. So your theory is this is collateral under the pledge agreement, under the security agreement, right? But those agreements have a different purpose from the waterfall agreement. The waterfall provision talks about collateral upon the exercise of remedy under the security document by the collateral agent. It's not addressing the bankruptcy courts implementing a plan that as Judge Schwartz said, takes off the lien, puts it out there. It's no longer collateral or proceeds, your adversaries would say, after it's released free and clear. So you can't just equate it with what's discussed in the security or pledge agreements. What would your response be to that point? Well, I would say that because the definition of collateral in the agreement included all the pledged shares, whatever the plan did to it, whether you say, one says the plan caused the liens to be taken off and essentially it's the same thing, nothing happened to it. You still have the receipt of what was and still is part of the pledged shares. In other words, the agreement is set up such that the creditors had what's defined as collateral, which I am arguing, and it's actually not an opinion, it's actually explicitly defined in pledged shares. All of the shares of TCH was collateral in the beginning. So the question becomes, and laying aside for a moment, whether it was on the exercise of remedies or received by, the question is, when the creditors, when my client received, the collateral agent, I'm sorry, received something out of the bankruptcy, what is that really on account of? Or is it still collateral? And the definition of what's in the agreement is, if you assume that nothing happened to it, it still has what is defined as collateral, which includes pledged shares. So under that universe, nothing happened to the collateral, and they still hold what was defined in the agreements as collateral. But if I understand you, then you're saying that what was received by the collateral agent, assuming it was received by the collateral agent at all, was not only the collateral, but a release of the liens? That doesn't make any sense, because the only purpose of the collateral is to ensure that you get reimbursed. They got paid, they didn't get the collateral and a lien release. That's correct, Your Honor. They got either, under their view of the universe, I would say they still have the collateral, what's defined as a collateral, or for all the reasons we say, an actual exchange occurred because the definition of proceeds in the agreement says not just what is actual proceeds of an actual sale of the collateral, but it is probably the most broad the English language can make the definition of proceeds. It includes really anything that is received at any time paid or payable under or in connection with any of the collateral. So when something happens to what was clearly collateral in the beginning, and these creditors received what they received because they were secure creditors, there was really no other reason, they had no other position under bankruptcy, this was not a gift to them. What they received falls within the definition of proceeds, because the definition of proceeds here is defined by the agreements, not by UCC Article 9 like in Momentum. Forget we don't have Momentum, we are just looking at this contract in this transaction. Right. But you made a point about what the creditors got as secured creditors. Let's talk about exercise of remedies. Yes. Where was there an exercise of remedies here? These distributions or events happened pursuant to a plan. Yes. So I think the remedy itself, the concept of what is a remedy is obviously not defined in the agreement as sort of a standalone definition, but I would argue it is actually wrong for the lower courts to then reach into sort of a vague concept of how active do you have to be for it to be an exercise of remedies, because what we have is basically the agreements themselves making clear that mere acceptance, this is ICA, the Intercreditor Agreement 3.1C, it makes clear that the mere acceptance of collateral proceeds is itself an exercise of remedies. That seems the security documents do provide for some specific remedies, right? Yes. Like foreclosure, for sale, and those seem to be the kinds of remedies that would be specific to documents and agreement of the parties as to remedies to be provided. Your argument seems to be that the exercise of remedies pursuant to the security agreements is the same as the exercise of powers by the collateral agent that are provided by the bankruptcy code itself. So I would argue that those examples are really just examples and that the agreement doesn't seek to set a certain level of activity that the collateral agent has to reach for it to be an exercise of remedies. Is there no difference between remedies under the security documents and remedies under the bankruptcy code? I believe that since neither is really actually defined specifically, I guess it's a metaphysical question, but what I would argue is that the agreements themselves, when it talks about exercise of remedies, not only is it not setting any low threshold, those are just examples, and it basically says just even accepting collateral is enough remedy, which is pretty much if you're sitting there and collateral just drops out of the sky and hits you on the head and you agree to accept it, which is it did a lot more than that here, then I would say that's a fairly low standard for what it is. And we have to keep in mind, this is a 4.1 is the only provision for billions of dollars worth of values to how it will be divided up. So the notion that if the collateral agent didn't do enough under some big definition, the whole thing just falls out of really the only provision that's meant to divide up all the value that the severe creditors had, I think is an unreasonable reason. I think the point that Judge Krauss is trying to make is you're conceptualizing the water parole provision as trying to address everything. Your friends on the other side conceptualize it as making sure that the collateral agent is not misallocating proceeds, but why should this provision, which is phrased in terms of the collateral agent, be read equally to apply to free and clear at the other end of a bankruptcy provision? That's the big picture question here. Because what's coming out the other end of the bankruptcy is also going to the collateral agent. The plan itself explicitly says that the collateral agent is deemed to be just receiving all of the collateral and proceeds. But that's not at the direction of the required secured parties. That's as a result of a bankruptcy approved confirmation plan, it's a condition of the exercise of remedies has to be by virtue of this direction. It didn't have to be, but the plan also confirms and the collateral order also confirms, as explained in our brief, that the collateral agent was directed to... That's a different order. I understand your point on that. That is different. And also was directed to sign on to the plan support agreement, which led to the plan. Thank you. Mr. Hellenberg? If the court please, Mark Hellenberg on behalf of the appellants. With the court's permission, I will spend 10 minutes discussing whether the 4.1 waterfall applies and Mr. Maloney will spend the remaining five minutes discussing the due on sale issue. Now, with respect to the applicability of the waterfall, the court has asked exactly the right question, which is why were the liens released and when were the liens released? And what Momentum teaches us and is absolutely correct is that what released the liens were the distributions under the plan. It is the payment on the claims that caused the liens to be released. And you can analogize this directly to a mortgage on a house. If I buy a house with the benefit of a mortgage loan from a bank and they get a lien against my house and I then sell the house, the mere fact that I sell the house does not remove their lien. Unless they get paid, the buyer, my buyer, takes subject to that lien, which is why buyers generally require the lien to be paid off. So it's the payment that releases the lien. I think you understand that you view this as a payment in satisfaction of an obligation. And the appellants here are viewing this more like a foreclosure itself. But where we have here what's essentially the transformation of assets that were collateral. And without a specific definition, it does appear with a list of all of the assets that were included. And it can be viewed as originally the collateral. They may have taken some different forms, but there's still some form of them, whether in cash distribution or in newly issued stock, are being returned to these creditors. Can we say this is not collateral without taking on, as appellants suggest, a per se rule that any transformation within a organization of an entity makes the assets lose their character as collateral? That's several questions, Your Honor, and I will try to answer them all. First of all, no collateral was transferred to the secured creditors under the plan. The hard assets, and really, if you look at the debtor's own diagrams, starting on page 20 of their brief, but if you look at Exhibits 7 and 8, you will see that the hard assets are in the triangle, and they always remain in that triangle, which are the operating subsidiaries of TCEH. They never move, ever. But other assets do move? No. No assets move between TCEH and reorganized TCEH? No assets? Zero? Zero. Okay. So what is this transfer of activity, interest in subsidiaries or other things between TCEH and reorganized? One holding company gets swapped for another holding company. Basically, they just change the name of the holding company. And let's be clear, while technically the stock of that holding company was pledged, that stock had zero value, because at the operating company level, secured creditors are only getting 41 cents. Unsecured creditors are getting zero. Is that somewhere in the record? Yes. And so the value of that stock is zero. That swap of holding companies is completely without substance. Where's the lien on the collateral then? Is the collateral still subject to a lien, and who has interest in that lien? The liens were released pursuant to the plan on account of the payment. So this is all happening concurrently, or very close in time? Theoretically, and really, the debtor's own diagrams, 6, 7, 8, 9, are perfect, because they give you exactly the order. First, the corporate reorganization occurs. As a practical matter, it all happened instantaneously, but theoretically, the corporate reorganization happened first. And you will see the basis gets increased pursuant to a technical sale of non-voting preferred stock that, under the tax code, had the effect of getting the basis. Which entity's basis? The basis of the debtor, which the secured creditors now own by receiving the equity. So the basis all gets increased. The holding companies are swapped out. Then, after all that is done, the stock of the holding company is distributed to the secured creditors, pursuant to the plan, and at that point, and only at that point, all the liens are released. The liens are being released because they've been paid on their secured claim. By definition, their secured claim is limited to the value of their collateral. And since they're getting the value of their collateral through the stock, that pays their claim in full, and it goes away, and the liens go away, the same way when you sell your house and you pay off the bank, the mortgage lien goes away, because there's no more debt, because the bank has been paid. That's all that happened here. All the liens on the holding company stock and the hard assets of the operating subsidiaries are released, pursuant to that distribution under the plan. But why isn't it just, maybe in a different character, but why isn't it just taking on the status of collateral, even with other kinds of liens, like the protection liens? There's a continued interest, in other words, on the part of the creditors in various assets that it's not entirely paid out. There is some degree to which the value was being exhausted through issuance of proceeds, and to protect against that, we have the adequate protection liens come into play. Your Honor, the adequate protection liens apply during the pendency of the case, and they compensate the secured creditors from the inability to obtain their collateral, because the automatic stay stops them from exercising their remedies under the agreement. And that, by the way, is why no remedies were ever exercised. The remedies, by the way, are very clearly set forth in Section 5.5 of the Security Agreement and Section 12 of the Pledge Agreement. And not only was there never an instruction to exercise those remedies, but the automatic stay prohibited the exercise of those remedies. Because one of my questions was, what's wrong with your adversary's argument about exercise remedies? So we know there were no remedies exercised, and within the context of 4.1, remedies, in the context of 4.1, clearly means the remedies set forth in the security agreements. What about the cash collateral order, though? Your adversary may mention that there's language in the cash collateral order that suggests that that was something at the direction of the required secured parties. Yeah, that's nonsense, Your Honor. Okay, first of all, the required secured parties never issued any direction, period. And the required secured parties are only the swap debt and the bank debt. It is not the firstly notes that DTC represents, because they came later, and they were not included in the required secured party category. So whatever the collateral agent did with respect to the cash collateral order, it was not at the direction of the required secured parties. Can you help us with the understanding of what happened with the preferred stock sale here? Yes. Because part of the criticism that you make about whether or not the distributions here included or constituted collateral proceeds of collateral is that there weren't third parties involved. With the preferred stock, obviously, there were third parties involved, and there's a cash infusion that results from that in distribution. You make the argument that that was not the assets itself, that that was simply control that was being exchanged for 70 million. Even control would seem to be one of the aspects of the rights attendant to the assets themselves. How is it that we should think about the preferred stock and any distributions that flow from that as not being proceeds of collateral? Well, first of all, Your Honor, again, it was preferred stock, not equity. So ownership of the hard assets never moved, never changed. 100% of it always stayed in the same place. Preferred stock is not ownership. Okay. It is basically like debt. It is $70 million while it would be a lot of money to make. In the context of this case, it's a pretty trivial amount. And the problem in the logic that DTC makes is that they say, since every sale results in stepped up basis, must be a sale. But that's not true. This is a technical, really non-substantive transaction that meets the tax code, but it has no real impact on the ownership of the assets. The assets were always owned 100% of the time by the holding company, and ultimately became owned by the secure debtors since the holding company had no more equity. Before I sit down, Your Honor, I'd just like to point out that since the briefing closed, momentum was affirmed by the district court. And that's at 218 Westlaw, 32842, Southern District of New York, November 30th, 2018. Good morning, Your Honors. It's Tom Maloney on behalf of Jay Aaron. And I'm going to argue the kind of the ironic point that even if the collateral agency agreement applied here would not give them any of the relief they seek. And that's because the collateral agent never received consideration on account of a claim for unsecured interest. And there's nothing in the agreement that provides that that payment is effectively implicitly subsidized by other pari pass suit creditors who have the exact same third lien priority under 4.3. And maybe I'm misunderstanding, nothing in the agreement section 1.1 at A190 expressly includes interest and fees that accrue after the commencement of bankruptcy or insolvency, regardless of whether they're allowed claims in bankruptcy. The definition of secured obligations, which incorporates that provision, Your Honor, is broader than actually what's distributed under 4.3. It's a very, unfortunately, it's a pretty technical argument. And if Your Honors want to follow up, if you have the collateral agency agreement in front of you, I can walk you through it. Or if you want to look at it later, it's at A175 in the record. But if you start with... Is the problem really that it's technical or that it's ambiguous? I don't think it's ambiguous at all. I think it's quite clear. If you allow me to kind of walk you through the agreement, I think you'll see it's actually pretty clear. So if you start with 2.1, it says that all liens on the collateral shall rank pari pass suit except as provided in 4.1. So we jump to 4.1, which is where all the action is. And the 4.1a creates this fourth tier priority scheme. We're both on the third tier. We all agree with that. And it's a key definition, which Your Honor alluded to, Justice Judge Bemis, which was basically the definition of secured obligation in 1.1, and it picks up other definitions. And that is plainly broader than what's distributed. If you look at the definition of secured obligation, it includes, for example, obligations that are absolute or contingent, due or to become due, now existing or hereafter arising. Clearly, you're not distributing on So the definition is broader than what's actually distributed. So if you look at 4.1, in two provisions of 4.1, it limits the amount of the set of secured obligations that's actually distributed to a subset of those obligations that's actually owed by the debt. And the way it does it is first, if you look at 4.1 itself, in the preamble, it says it's subject to 4.3. If you look at 4.3b, you see that every note holder has to certify to the collateral agent the amount of their debt for purposes of the distribution, so to the swore or fall, and it has to be the amount certified as owing is presently due and owing from the borrowers or the other loan parties. So to the extent they say it's the financing documents, that's inaccurate, just plainly inaccurate. It has to be from the borrower. And the confirmation appears again in 4.13a3 itself, which says that only the amounts that are due and payable are the amounts that actually are paid. So you have two confirmations that it's only a subset of the broader universal secured obligations. The ones that are due and payable are actually due and owing from the borrower that are paid. So in these circumstances, what would that be? Well, in this circumstance, you heard it's in the record and was found by the court below that secured credits are paid $0.41. Also in the record, the plan provides for no post-petition interest to accrue once there's a petition date or for any default interest, and that's in the record at A3844. You can look at the confirmed plan. So it's a matter of federal bankruptcy law, no interest accrued. And so all cases they cite all recognize this as an exception to when there's no accrual of interest. Are you saying that the provision that I've started out with is just nugatory, that it's developed by bankruptcy law? No, it's intended for a different purpose. The definition of secured obligations is intended more broadly in that specific provision is intended to accommodate the fact that we came in on the ground floor of the Texas utility company. This is going to be a very complex economic structure. We anticipated there'd be years of money coming in down the road, including that there would be subordinated debt in the future. And in fact, if you look at 7.9 of the ICA, you'll see 7.9 refers to the fact that there may be subordinated debt, second lien debt later on. It has to be in a particular form, which they have us exhibit. But following up on what Judge Bevis was asking you then, and a comment you made, you said post-petition interest is unavailable under the bankruptcy code. And if that's the case, then even if they satisfied all these conditions precedent, they would still not get their interest? No, if they do get it. The way they get it is the second lien agreement, which is in the record at SA1 on. If you look at the second lien agreement, this is to deal with the possibility that the reason they're not getting the post-petition interest is not that there's no value to distribute. There's value to distribute, but there's been a challenge to my lien, and I'm not getting post-petition interest, and therefore it's not allowable. But there's a subordinated creditor, or there's some assets I don't have a lien on that I've lost that portion, but the subordinated creditor does have a lien on it or has made a claim on that. Under the SA, if you look at under section 2.01, which appears at page 10, and 4.02, which appears at SA17, the second lien creditor is going to have to pay us on account of a disallowed debt because of these definitions. So these definitions are to accommodate a true subordination situation. And we cite to, these are standard terms, so we cite to, in our brief at page 51, your honors, the ABA task force on first and second liens, and this is the standard definition that the task force actually recommends you use to deal with precisely the situation I'm positing now. Should we have the district court or the bankruptcy court decide this? Well, your honor, the reason they didn't decide this question is they thought the other question was pretty easy, and also, frankly, you don't get to the agreement if it doesn't apply. So I think if they had decided it, they would have come out, and certainly Judge Sanchez indicated when we went back the second time, I said, Judge Sanchez, just so we don't come back a third time, maybe you want to say something about this other topic, and he did. He said, he basically said, look, I don't see how this interest accrues and how you get that under this agreement. So we didn't make that the ruling. If our conclusion was the condition's precedent to the waterfall or not satisfied, we never reached this, correct? We never reached the question, correct. Thank you, your honor. Okay, thanks. I wanted to focus the court's attention on just a few provisions that I think bring us back to, again, the definitions of proceeds and collateral that are actually in the agreements, as opposed to different theories about what might be proceeds or collateral. The plan itself just states explicitly, and this is in the record at 5384, that the collateral agent is receiving what it's receiving under the plan in exchange for the collateral, and so what's coming out is just either collateral or proceeds of collateral, given that the definition of both encompasses the entirety of what's coming out. Right, but there are a couple of ways the collateral agent can receive things. Collateral agent can foreclose, sell, lease, license without the bankruptcy courts having put it in a plan, right, and have some ability to do that, to preserve things during dependency before confirmation. But the question is, why should we treat the receipt of things after or upon plan confirmation in the same way? Why is it that 5384 puts that on the same footing when the Waterville provision speaks very specifically about it having to be received and received upon some causal connection, the exercise of remedies? I think you should, the court should still hold that it was an exercise of remedies, because the collateral agent did do various things, and given that the word remedies is not specifically defined, although it's defined in a very open way, with only a few examples, with the lowest wrong being just receipt of value, and that really anything even in the possession of the collateral agent... That would read that provision out of there, that anything the collateral agent gets is necessarily on receipt. You'd render that surplusage. It ended up being rendered a surplusage here because the definitions of collateral and proceeds in the other agreements that basically plug into the inter-creditor agreement were so broad. If those were narrower, then I suppose that might have a function. But here, the parties chose to define proceeds and collaterals so broadly that it really encompassed not only the equity in TCH to start with, but also everything that flowed from it, including everything that comes out that's an exchange collected on account of anything attributable to actually once having held the collateral. In the beginning, they had collateral and liens. At the end, depending on who you believe, either they still have the collateral or they just lost the collateral. In any event, the value they received from the situation was as a result of what they held in the beginning, which is collateral. If the court has any other questions, I'd be happy to address them. Otherwise, we'll rest on... Can you speak to the question about the preferred stock and how we should think about that inflow of constitute proceeds given, well, a large dollar amount, perhaps not relative to the rest of the assets here. What's the significance that would actually have for this bankruptcy? Frankly, I think it has real no significance. I think the reason it doesn't really have any significance is that the definitions of collateral and proceeds did not require there be a third party sale. In fact, as we pointed out in the briefs, the creditors here contemplated there might be affiliated sales just within the affiliates, and it would still constitute still collateral and proceeds of collateral. I think, frankly, that issue was injected by the lower courts and we've all had lots of philosophical debates about it, but there is no universal requirement that there be a third party sale. I think if any ruling from this court is misunderstood as saying a debt for equity swap or a transaction that looks like this or that cannot be collateral proceeds divorced from the actual definitions the parties agreed on. Maybe, Judge Krause, maybe I heard your question going at something different, so let me ask this. If the preferred stock sale was made to somebody other than anybody involved in this and it resulted in cash, how is that the collateral or proceeds of collateral? How does it even count? You had, Judge Krause, your answer to Judge Krause was to focus on the fact it's irrelevant that it would involve third parties. Correct. And I know that the district court and the bankruptcy court, when they were thinking about third parties, were thinking about, sort of, was it a familial transfer of assets to corporate relatives? And I understand, but I think the preferred stock issue was something different. Do I have a misunderstanding? No, that did involve third parties. That did involve third parties, so why isn't that totally different? And it involved the sale of something that didn't exist until post-bankruptcy and assets came in from some other entity. I mean, it's not collateral, it's not cash. Well, I think it actually involved the sale of something that was created as part of the transaction. And when it was created, it actually was collateral by the way that the parties defined it. We have to go back in time in terms of how it came into existence for the transaction. That's right, because once the Vistra energy is created, it falls within the definition of agreed on it. Now, here, again, I guess we return to the fact that what the parties intended, clearly by these two definitions, was to capture any other entities that were created that would subsequently engage in any other transaction. Okay, thank you. Thank you all for well argued.